Good morning. May it please the Court, I'm Donald Horgan here on behalf of the appellant Bruce Yeung. This is a criminal case that turns almost entirely on the credibility of the complaining witness in the case, and I'm certain the Attorney General will take issue with that. But I think that a careful review of the evidence bears it out. If you're right, what difference does that make? Because it will go to the issue of materiality on the Brady, perjured for the Brady violation that we're going to discuss right now. The other side might point out that it takes issue with that, but I have some questions about that. I mean, you know the facts. I don't need to go through the whole thing. I mean, she was found lying on the ground with the defendant standing over her. She was screaming and yelling. You could hear it on the 9-11 tape. The neighbor calls up and says something terrible is happening out there. I mean, there's a ton of contemporary evidence suggesting this was a sexual assault. I think only, Your Honor, at the conclusion of a whole night of encounter that ends with that incident and with Mr. Yeung standing over her. Explain away that. I mean, she's lying there with her clothing in disarray, screaming and yelling at the top of her lungs, so much that a neighbor finally calls 9-11 and the police come and they find this scene. It looks the farthest thing from a rational person's mind from a consensual act. Well, to point out two points of the defense, one being the presence or absence of consent and the belief in consent. What has happened during the evening up until that point is not witnessed by anybody. It's only Mr. Yeung and you. I understand that, but what difference does it make? It looks at the end of the evening that she was drunk and throwing up, and this guy's got her clothes up on the ground outside in public, screaming and yelling? At which point he stops and is standing there doing nothing when the police arrive. That's the only point, Your Honor, where I can talk about it. Your argument seems to be correct. Even the inquiry as to whether or not, you know, by her civil lawyer, would suggest that that has to be turned over because the financial interest in the outcome is clearly great. So the question really is whether it's material. And the district court seems to have decided, previous courts seem to have decided, that it wouldn't have made any difference because there was so much evidence. Agreed that it did, Your Honor. I would point out that there was an initial trial in this case. All of the overwhelming evidence, his statement, there was a hung jury. And so, I mean, in the presence of what is purportedly or allegedly overwhelming evidence, that first jury didn't find it overwhelming, apparently. And I understand that the argument will be, well, there may have been other differences, there may not. But that overwhelming evidence that you just cited was in the case. And incidentally, some of the evidence that is corroborated by others prior to that point, this is not a terribly significant one, but they're at a karaoke bar where they're with what's called a PR woman. I don't know what those are. Well, now I know what they are. But at any rate. A companion or something. I'm sorry? An evening companion. An evening companion. So when in the presence of the evening companion, Elsa's testimony is that I, you know, I was resisting the advances of, or I was, I expressed no interest in Mr. Jung. And I accidentally knocked over a few glasses. Well, the testimony of not only, not only the statement of Jung, but the testimony of Mr. Wong, an independent witness who's there, is that in fact she had a fit and picked up and threw glasses, apparently in response to her perception that Mr. Jung was not paying sufficient attention to her, but was rather focusing on the PR woman. So I would suggest that that, it's a suggestion that Elsa may not have been entirely accurate or credible on anything else she may have said from that point all the way to the time that the police arrived. Judge Trott might mention that he agrees that it is favorable evidence. I don't think anybody would seriously dispute that. The Attorney General says arguably favorable. It clearly was favorable. I think the chronology is significant. I'll take a very brief time summarizing that. This incident occurred in October of 1998. In December of 1998, the civil attorney calls the prosecutor, wants a police report, wants some more details about the event, and she gets, she, the civil attorney, gets a letter in response from the prosecutor. Yeah, here's the police report. By the way, if you, if this witness were to, if Ms. Sin is to testify before the conclusion of the prosecution, that's going to be a problem for her credibility. So what is that? What does that mean? Well, that's coaching. That's collusion. That is, let's not let this come out because we don't want relevant evidence to get in front of the jury that could hurt my witness. And this court has said, I think it was in Silva versus Brown, that the furtive conduct on the part of the prosecutor in connection with evidence that should be used as exculpatory evidence is significant for purposes of determining materiality. So that, again, bears on materiality. I think it's significant. Ms., the case goes to trial in October of the following year, 1999. October 5th, Ms. Sin testifies. Two days later, she files the civil suit. The clear inference being that this was held back until she was off the stand, at which point she thought she could escape any attack on the basis of credibility. It's still before, after the verdicts come in on October 13th, but before sentencing in November. Again, the civil attorney contacts the prosecutor, asks for some information about the docket and so forth, more information about the case. At this point, it's got to be absolutely clear to the prosecutor that there has been a civil suit filed. And, in fact, there has been on October 7th. So I think it's beyond any dispute that this evidence. The real question, as Judge Trott said, is whether it's reasonably probable. There would have been a different answer. Well, again, if we're not. And presented to the jury. I already have pointed out what happened the first time around and that that was all in front of the first jury. There are three other things that the prosecutor does in this case. The prosecutor moves to admit this evidence from an expert to bolster, essentially, the testimony of the complaining witness to have an expert come on and say, yes, not only is conduct, you know, kind of a blank aspect or a lack of affect, that can be consistent in general terms with post-traumatic stress syndrome or rape trauma syndrome. Goes farther than that and says that, yeah, I saw her on the stand. Everything, her demeanor, her aspect is absolutely consistent with somebody who's been traumatized in this way, who's been raped or who's been a victim of an attempted rape. An attempt to pump up the credibility of this witness. There's an attempt by the prosecutor to keep out the book that is called Affairs of the Heart, which was admitted, incidentally, at the first trial, which describes or prescribes, rather, for a person interested in a sexual encounter with another to be coy. But coy just doesn't mean coy and standing alone. It means being half-yielding, half-rejecting. Well, if you read the statement by Mr. Jung, it is an account whereby he says, at some points, Ms. Sin is inviting my advances. We've already gotten testimony from her. I just read this for the third time, and what he says is she kept saying no, but I took her clothes off anyway, because Chinese ladies say no when they really don't mean no. I mean, he says umpteen times she said no, and he says I took her clothes off anyway, because, you know, she really didn't mean no. That's the way it boils down to it. That was at the end. That's correct, Connor. Ouch. He says she said no, and he ends up with her clothes in his hand, touching her all over her body. He won't take no for an answer, is the way I read his statement. As I read his statement, it was that when he would make physical advances to her, they were returned. At points, they were returned. From which he took, from which he inferred that she, in fact, was interested. He decided he wasn't going to pay any attention when she said no.  And in addition, the testimony that Wong testifies to, or the encounter where he describes them looking as if they are completely consensually kissing in a karaoke bar. You know, you might have a better case if she hadn't been found screaming hysterically on the street, on the ground with her clothes on. Well, as he says, it's at that point that he stops, but I would submit that everything that comes before that point is relevant to his state of mind. I mean, if he is continuing an assault at the time that the police arrive and she's screaming, I would grant you that would be it. But that's not what's going on. And he's screaming from neck to neck. And he's standing away from her with a cell phone in his hand and a pager. And that's how the police... Was that before or after it looked like he hit her? Well, curiously, she says that he never did hit her. Where'd she get all the scrapes and bruises and marks on her? Apparently from being on the ground, but it wasn't from being struck. Not by her account. And I'm not taking issue with the fact that there is in this record that material on the other side and that there are statements of no and so forth. I'm not saying that at all. What I'm saying is that the encounter throughout the evening, even some of it of which is witnessed by Mr. Wong, does suggest not simple resistance and unambiguous resistance at all. And I think that's critical. The final relevant point on materiality, because I think the fact that it's favorable, the fact that it's been suppressed and established, is the attempt by the prosecutor to keep out the final piece of evidence that would bear again on the credibility of Ms. Sin, which is whether or not she was about to be fired, whether she was trying to curry favor with Mr. Jung, whether she had a motive of vengeance towards Ms. Yu, who was trying to stand in her way for advancement. So for all of those reasons, this is a brain violation. And I think, I mean, one question you ask is, is this a case where Ms. Sin to be taken out of the case, could it really have been prosecuted? Could it have been a successful prosecution? I mean, wasn't her averment of non-consent critical to this case? And if it was, if she was the central witness, and indeed she was, then I think this Court's precedent has said that impeachment of this type has to be permitted.  Yes, time for rebuttal. Yes, thank you. May it please the Court, Lisa Ashley Ott for Respondent. First of all, the issue before the State Court was that their habeas relief was not available unless favorable evidence puts the whole case in such a different light as to undermine confidence in the verdict. And for this Court to overturn the State Court's ruling, it has to apply a highly deferential standard under the EEDPA, and it has to find that that ruling was unreasonable. Here, there's four things I want to talk about. I think everyone's agreed that the only issue here is materiality. We've conceded that it's possible that this financial motive could be considered as favorable evidence, so the issue is whether or not it was material. First of all, this is not something like a deal with the prosecution for immunity. It's not watershed evidence. This is not a surprising thing that a victim of an attempted rape, like Elsa in this case, would consider pursuing a civil suit. I don't think the jury would have found this to be earth-shattering evidence. I don't think it's as huge as the public would like to make it seem. Well, you don't think that, but, I mean, how do we figure that out? I mean, it's well known that the financial motive of the witness in the criminal case is something of which jurors look askance. The William Kennedy Smith case down in Florida was blown to pieces when it turned out that she had been negotiating for a possible financial reimbursement for her story in magazines. I mean, financial interest has the potential to wreck the credibility of the witness. Well, I could argue that if she hadn't been contemplating the civil suit, it could have undermined her credibility, because if this really happened to her, why wouldn't she contemplate a civil suit? And also, the fact that she actually voluntarily dismissed the suit later on is an indication that it was not material gain, was not a driving force in her testimony here. I know that the trial court at the time, the suit hadn't even been filed, yet it was dismissed. But in terms of our review in determining whether or not our confidence in the verdict here is shaken, we can certainly consider the fact that she decided to dismiss the case and she didn't seek financial gain in this case. Do you concede that this was a Brady violation, to have failed to turn over her story? No, I don't concede that. I concede that it could be considered favorable evidence. I do not concede that it's material, and therefore it's not a Brady violation. Well, if you concede it was a violation of the prosecutor's responsibility to fail to turn it over? I would concede that it might have been a better idea for the prosecutor to turn it over. A better idea? Well, I don't think they don't have a duty to turn it over. Some people get in trouble. They start playing it close to the vest, as Justice Souter said in Kyle v. Whitley. It's act too close to the wind to turn over and drown. And that's why I think it would have been a better idea for the prosecutor to turn it over, but I don't think it was a Brady violation. It seems it was a constitutional requirement to turn it over. Only if it was material was it required to turn it over. Well, you don't know that it was material at the time. It couldn't be. Well, at the time, a suit had been issued. When the prosecutor learned about that piece of information, he should have looked just approximately. It had the potential to allow defense counsel to challenge her credibility quite effectively. At the very least, you give it in camera to the judge and let the judge make the rule. This is precisely what the Supreme Court has said prosecutors have to be careful. Certainly, if I were to counsel a prosecutor in this case, I would counsel that they should turn it over. I think that prosecutors have a duty to any close case to turn things over. I would agree with that. However, in this case, it simply wasn't material. And I know that— In the end, it didn't turn out to be material. Correct. The evidence in this case was so overwhelming, and I know we use that term quite often in our briefs when we discuss evidence, but not only is our office using that term here, the district court also found the evidence to be overwhelming. The screaming didn't just happen at the very end when the police arrived. The screaming awoke one of the neighbors. He heard screaming. He went and looked out the window. He didn't see anything. He went back to bed. He heard more screaming. He got up. He looked out the window, saw a man standing near the car, saw someone laying on the gravel, called 911. The screaming continued during the 911 call. It was heard by the 911 dispatcher. He then was told to stay on the line by the 911 dispatcher, to stay watching what was going on. He saw a poet hit the victim. Now, the victim says that she wasn't hit. She doesn't remember much of what happened that night. When the police arrived, what state of dress or undress was the defendant in? The defendant's pants were down. His underpants were not down when the police arrived. The victim's pants and underpants were down. There was vomit on her clothes. Her purse was open and laying on the ground. Her makeup case was strewn about. One of her shoes was missing. She had loose gravel on her back and on her buttocks. She was crying hysterically. So here we have screams and crying that did not just stay on the last instance. We have it at least 10 to 15 minutes. She was crying hysterically. It took quite a long time to get her calmed down. That evidence, plus the evidence when she goes to the hospital and there are scratches and abrasions on her chin, on her arms, on her thigh, near her genital area. There's also scratches on the appellant in this case. I cannot explain all of these things. He conceded, she told him on numerous occasions, to stop. Right. And the state of the law now is that stop can stop. That's right. Just his statements to the police alone are powerful evidence in this case. This is not a case where a reasonable person can believe that she was consenting. He says that she screamed and he told her not to scream and she would stop screaming but if he touched her she would start screaming again. He says that Chinese women need to be helped. They're very, very conservative and no doesn't mean no. She, throughout the evening, has been telling him no but she doesn't stop him, he says. She says no but he doesn't stop me. It's unclear is she able to stop him. Is she so drunk that she can't stop him? But she certainly is not consenting and a reasonable person would not find consent here. Finally, I'd like to point out that there has never been a declaration from trial counsel in this case stating that trial counsel did not know that a civil suit may be filed or was filed. The suit was filed two days after the testimony of the victim in this case but a full six days went before the jury returned its verdict. We simply don't know what trial counsel did or didn't know about the existence of a civil suit. Because the trial counsel knew that there was a civil suit. You just said we don't know one way or another. That's right. We don't know one way or another. What's your point? Well, my point is that it was the appellant's burden to show that they didn't know that there was a civil suit here. If they knew, then they weren't prejudiced. An appellant hasn't shown that they didn't know. He submitted a declaration. Did you file a declaration saying you knew? No, we didn't. Well, that's a tie. No, because we don't have the burden. The burden is on the appellant here. So, again, the state court reasonably concluded that its confidence in the verdict was not shaken by this evidence. And in terms of the first trial, as I stated in my briefs, I think that court has to look at this trial, this evidence, this jury, and can't really consider the first trial. But to the extent the court is interested in the first trial, the first trial, the jury went to deliberate. The jury came back. They had verdicts as to two counts but had questions as to other counts. After discussion with the attorneys, there was further instructions. There was an instruction given on voluntary intoxication. There was an instruction explaining more in detail the law of attempt. And there were some instructions regarding whether or not the consent instruction applied to the charges of her being too intoxicated. There was even further argument by counsel. Then the jury goes back, and they can't. They now disagree after this. I would submit this voluntary intoxication instruction. The jury can no longer agree as to the two verdicts that they had originally reached. And now they're a hung jury. To try to figure out exactly what was going on in that jury room in the first trial is really speculation, and it's really not the place of this court. But there could have been a million factors in which a hung jury in that case. The problem with the definition of materiality, such as the one we use, is that it permits prosecutors to get away with constitutional violations based on hindsight and looking back. And it frequently sends the wrong message to some prosecutors. You know, you can play it close to the best, and hopefully then later on with all the standards of review and everything else, somebody will decide in the cold light of day, well, it really wasn't a period because X, Y, and Z. But prosecutors shouldn't be thinking that way when they make these decisions, whether it's material or not. You have to turn it over. You have to turn it over. Prosecutors used to come to me and say, I have an ethical problem. What's that? If I turn it over, it's going to hurt my case. That's not an ethical problem. It's just a frustration that goes along with the rules. So, you know, many of the fellow judges are concerned that rules like harmless error and materiality send bad messages to prosecutors who don't get the message that you have to turn this stuff over in the first place. Then we wouldn't be here. I agree with you, Judge Trott, and I acknowledge the duty of a prosecutor to turn things over and to take that duty very seriously. And the prosecutor in this case, if they had called our office, we would have counseled them to turn it over. However, given that they didn't turn it over, given the standard of deference to the state court here, the evidence simply wasn't material, and we shouldn't have to go through a new trial because of the prosecutor's actions here. As to the other issues, unless the court has any questions regarding the other issues, I think that the briefs adequately address them. I agree with you. Okay, thank you for your time. Thank you. You have some time for rebuttal. Thank you. I don't want to appear to be piling on, but I just wanted to pick up with what Judge Trott said. I mean, I hope that the principle that emerges from this kind of argument isn't that it's okay for a prosecutor to make a determination about a potential exculpatory piece of evidence and say, well, if it's not material, there's not a problem, and that that's the inquiry. I mean, the inquiry has to be something different than that. There is an obligation ahead of time to determine if this is favorable evidence that we know about and that we haven't disclosed to the defense that it's not okay, it's not legitimate to withhold it if we can make a reasoned decision that it's not material. In this case, again, I again submit that it was material. I won't beat a dead horse and say again that the evidence at the first trial, every piece of evidence that's been deemed overwhelming in the second trial was introduced at the first trial. I heard counsel talk about, well, there was an instructional conference, there were questions about this and involuntary intoxication and so forth. What I didn't hear her say was if there was any misinstruction at the first trial or that there's any reason to doubt the legitimacy of the result in the first trial, which was that that jury that heard all of this purportedly overwhelming evidence did not reach a verdict of guilty, which I think is terribly significant. And again, to pick up on a point of Judge Trotz about the favorability or not of this kind of evidence, it has been stated by both the federal courts and the state courts that financial motive is a prototypical form of bias. It's one of the most well-established bases for attacking a witness that's available. And in no way can that be minimized or said to be anything less than extremely important that should have been disclosed here. So that's all I have. Thank you. The matter will be submitted. And the last case on the calendar, United States v. Schrader, is also submitted on this panel. We'll be in recess. Thank you.
judges: Trott, T.G. Nelson, Paez